UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SAGAR MEGH CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| UNITED NATIONAL INSURANCE CO., | ) | Case No. 12-cv-4959 |
| | ) | |
| | ) | Judge John W. Darrah |
| Defendant. | ) | |
| | ) | |
| NATIONAL REPUBLIC BANK OF CHICAGO, | ) | |
| | ) | |
| | ) | |
| Intervening Plaintiff. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Sagar Megh Corporation, filed a Complaint against Defendant, United National Insurance Co. ("United"), on June 21, 2012, asserting United breached its obligations to Sagar Megh under an insurance policy it issued and that United acted in bad faith. Sagar Megh moves for partial summary judgment, seeking: summary judgment on its breach of contract claim and awarding Sagar Megh $1,740,042.67, plus pre-judgment interest accruing on and after July 6, 2011, arising from the coverage under the policy and further reserving all rights of Sagar Megh to pursue its claims relating to Count II of the Complaint, which seeks declaratory relief and Count III, which asserts bad faith on the part of United. United filed a cross-motion for summary judgment, seeking judgment entered on its behalf for all three claims asserted in the Complaint, on the basis that Sagar Megh failed to comply with the protective safeguard condition set out in the Insurance Policy. These motions have been fully briefed.

**BACKGROUND**

Local Rule 56.1(a)(3) requires a party moving for summary judgment to provide "a statement of material facts as to which the moving party contends there is no genuine issue . . . ." Local Rule 56.1(b)(3) requires the nonmoving party to admit or deny each factual statement proffered by the moving party and concisely designate any material facts that establish a genuine dispute for trial. *See Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005). A litigant's failure to dispute the facts set forth in an opponent's statement in the manner dictated by Local Rule 56.1 results in those facts' being deemed admitted for purposes of summary judgment. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). Local Rule 56.1(b)(3)(C) further permits the non-movant to submit additional statements of material facts that "require the denial of summary judgment . . . ."

To the extent that a response to a statement of material fact provides only extraneous or argumentative information, this response will not constitute a proper denial of the fact, and the fact is admitted. *See Graziano v. Village of Oak Park*, 401 F. Supp. 2d 918, 937 (N.D. Ill. 2005). Similarly, to the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, including a fact which relies upon inadmissible hearsay, such a fact is disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997).

Here, United's cross-motion fails to comply with the requirements of Local Rule 56.1, which provides that a statement of material facts be filed in addition to the supporting memorandum of law. Instead, United simply included eight statements of "undisputed material facts" in the middle of its supporting memorandum of law with its cross-motion for summary judgment. The statement of facts required in Local Rule 56.1 has been described as such:

**It is a document separate from the supporting memorandum; it is neither a**

> **supplement to nor a surrogate for the memo.** Rule 56.1 statements should contain neither a narrative section nor a recitation of the summary judgment standards. . . . Likewise, 56.1 statements do not abrogate a party's obligation to recite its version of the facts in its supporting memorandum; it is inappropriate in one's memo to simply refer the Court to the 56.1 statement. **The purpose of the 56.1 statement is to identify for the Court the evidence supporting a party's factual assertions in an organized manner**: it is not intended as a forum for factual or legal argument.

*Malec v. Sanford*, 191 F.R.D. 581, 585 (N.D. Ill. 2000) (emphasis added). "Courts in this district have broad discretion to enforce the rule, and the Seventh Circuit regularly upholds strict enforcement of Local Rule 56.1." *Mach Mold v. Clover Associates, Inc.*, 383 F. Supp. 2d 1015, 1025 (N.D. Ill. 2005) (citation omitted). Accordingly, these purportedly undisputed facts submitted in United's brief in support of its cross-motion for summary judgment is stricken. United did, however, submit a separate set of undisputed material facts in conjunction with its cross motion, and Sagar Megh had the opportunity to respond to those facts; the facts asserted properly under the Local Rules will be considered.

The following facts[1] are taken from the parties' statements of undisputed material facts submitted in accordance with Local Rule 56.1. Sagar Megh is an Illinois corporation; United is a Pennsylvania insurance company licensed to do business in Illinois. (Pl.'s SOF ¶¶ 1-2.) Personal jurisdiction is proper as Sagar Megh is domiciled in Illinois and United regularly conducts business in Illinois, and venue is appropriate pursuant to 28 U.S.C. § 1391(b)(2). (Pl.'s SOF ¶¶ 4, 6.) Subject matter jurisdiction exists on the basis of diversity. 28 U.S.C. § 1332.

---

[1] Admitted Statements of Material Facts by Sagar Megh are designated as "Pl.'s SOF" with the corresponding paragraph referenced; Admitted Statements of Material Facts by United are designated as "Def.'s SOF" with the corresponding paragraph referenced.

*Sagar Megh and the Lake Motel*

Sagar Megh was created by Dipak Patel and his father, Ramanlal Patel, in 2003. (Def.'s SOF ¶ 1.) Sagar Megh purchased a motel building located at 9101 South Stony Island Avenue in Chicago, Illinois, and operated the Lake Motel at that property. (Def.'s SOF ¶ 1; Pl.'s SOF ¶ 7.) Sagar Megh was run as a family business, with Dipak and his wife, Alka, managing the day-to-day business of the Lake Motel and Ramanlal being involved in occasional activities. (Def.'s SOF ¶ 2.) At the time of the event in question, Dipak and Alka resided at the Lake Motel. (Def.'s SOF ¶ 16.)

To purchase the property, Sagar Megh obtained a loan from the National Republic Bank of Chicago (the "NRB"), a loan from the Small Business Administration, and a loan from TCB Investments, with all three creditors taking mortgages on the property. (Def.'s SOF ¶ 6.) When Sagar Megh applied for the NRB loan, Dipak indicated he had a net worth of $1,069,188.00 and an annual income of $51,939.00; he had a credit bureau rating of "fair." (Def.'S SOF ¶ 11.) When Sagar Megh applied for a loan modification in 2010, Dipak indicated his net worth was $34,408.00. (Def.'s SOF ¶ 11.) Beginning in 2008 or 2009, Dipak stopped receiving any payroll compensation from Sagar Megh. (Def.'s SOF ¶ 39(a).)

In 2004, Sagar Megh obtained another loan with another mortgage from the NRB, to perform renovations to the property. (*Id.*) Some of these loans were secured with personal guaranties by the Patel family. (Def.'s SOF ¶ 9.) Prior to the fire in March 2011, Sagar Megh had large outstanding loan balances, declining revenue, and increasing late loan payments. (Def.'s SOF ¶ 7.) In 2009, Sagar Megh was sued by the City of Chicago for violating the city's municipal building code. (Def.'s SOF ¶ 8.)

On or about September 30, 2010, United issued a commercial property insurance policy (the "Policy") to Sagar Megh. (Pl.'s SOF ¶ 11.) Subject to the Policy's provisions, fire is a covered loss under the Policy, including fire damages caused to the Lake Motel as the result of an intentional fire. (Pl's SOF ¶¶ 13-14.) A Policy endorsement provides that "as a condition of this insurance, [Sagar Megh is] required to maintain" "functional smoke detectors" in "all buildings, occupancies, or units." (Def.'s SOF ¶ 3; Policy at 52.) The policy further provides that United would not pay Sagar Megh "for loss or damage caused by or resulting from fire, if, prior to the fire, you: (1) Knew of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify us of that fact; or (2) Failed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order." (Policy at 52-54.)

*The Fire*

Early in the morning of March 5, 2011, a fire started in Room 109 of the Lake Motel. (Pl.'s SOF ¶¶ 15-16.) That day, the Sagar Megh employees present at the Lake Motel were Dipak, housekeeper Gabriella Valdez, guest reception desk clerk Ella Edwards, and assistant to the housekeeper Emsil "Ronnie" Hammond. (Def.'s SOF ¶ 14.) Dipak had a master key, and the housekeepers would occasionally receive individual room keys or the master key to clean rooms. (Def.'s SOF ¶ 16.)

Edwards recalled that Dipak was at the Lake Motel when she arrived to work at 7:00 p.m. and was still there when she was made aware of the fire at 3:00 a.m. on March 5, 2011. (Def.'s SOF ¶ 15.) Dipak was in an office with surveillance camera monitors, and he could exit that office without Edwards knowing. (*Id.*) Valdez recalled that Dipak was at the Lake Motel at the time of the fire and that, while he would normally come in later, she saw Dipak at the Lake

5

Motel when she arrived at 10:00 p.m. (Def.'s SOF ¶ 17.) Valdez was first instructed to clean two rooms on the front side of the Lake Motel but then was instructed to clean four or five rooms on the rear side of the building. (Def.'s SOF ¶ 18.) While she cleaned the rooms to the rear of the Motel, Valdez did not see Dipak. (*Id.*) After cleaning those rooms, Valdez returned to the laundry room to wait for Hammond, her assistant, but after waiting too long, went to clean the two rooms at the front of the Lake Motel. (*Id.*)

Using a key to open the door to the first room she was to clean, Valdez noticed smoke. (Def.'s SOF ¶ 19.) In the bathroom, Valdez observed a charred piece of paper on the floor, a hole in an interior partition wall separating the bathroom from the bedroom, and fire within the interior partition wall with what appeared to be insulation burning in the wall. (*Id.*) Each motel room contained a smoke alarm. (Pl.'s SOF ¶ 8.) She grabbed a towel from the floor and a smoke alarm fell out. (Pl.'s SOF ¶¶ 17-18.) Dipak knew that when people smoked in rooms and the smoke alarms would sound, the sound would bother guests, and so people would remove the batteries from smoke detectors. (Def.'s SOF ¶ 5.) No wire mesh or "bird cage" type wiring was installed around the smoke detectors. (*Id.*)

Edwards, the receptionist, did not have any reports of people who should not have been in the room going into Room 109 the evening of the fire. (Def.'s SOF ¶ 21.) She also was not aware of anyone saying that the last guests of Room 109 were in that room before the fire began. (*Id.*) After she learned there was a fire, Edwards knocked on Dipak's office. (Def.'s SOF ¶ 20.) Dipak left his office and was rubbing his eyes, which Edwards observed were red. (Def.'s SOF ¶ 20.)

Dipak stated he was watching the surveillance camera monitor and observed Hammond walk from Room 109 with linens, including towels, leading Dipak to conclude that Room 109

6

was more than half way cleaned. (Def.'s SOF ¶¶ 20, 22.) Dipak went to speak to Hammond, who informed Dipak that some smoke was found in Room 109. (Def.'s SOF ¶ 22.) Dipak said "it must be a cigarette butt or something," and sent Hammond to check a basement in another area of the Lake Motel. (*Id.*) Dipak asserts he was never in Room 109 on the evening of the fire. (Def.'s SOF ¶ 23.) Dipak did not attempt to recover the surveillance camera data for this evening, and a few days after the fire, the surveillance camera system was stolen. (Def.'s SOF ¶ 23.) None of the employees of Sagar Megh, including Dipak, attempted to use a fire extinguisher to put out the fire. (Def.'s SOF ¶ 39(i).)

John Morris, the last registered guest of Room 109, stated that the room was clean when he and his female guest entered the room. (Def.'s SOF ¶ 38.) Morris further stated that neither he nor his guest smoked in the room, or smoked at all, and that there were no cigarette or cigar butts in the room when he left to return the key. (Def.'s SOF ¶ 38.) Morris indicated that neither he nor his guest brought anything into the room. (Def.'s SOF ¶ 38.)

Two other guests of the Lake Motel that night, Clifton Carter, Jr. and Brandon Brown, stated that they woke up on March 5, 2011, to the smell and presence of smoke and did not hear any smoke alarms sounding. (Def.'s SOF ¶ 4.) At 3:43 a.m., the first fire engine from the Chicago Fire Department (the "CFD") was dispatched to the Lake Motel. (Pl.'s SOF ¶ 19.) CFD Lieutenant Timothy O'Toole was on location during the fire and heard smoke detectors in rooms of the Lake Motel. (Pl.'s SOF ¶ 20.)

Sagar Megh is unaware of anyone who would have any motive to set a fire at the Lake Motel. (Def.'s SOF ¶ 24.) After the fire, the City of Chicago issued a demolition order, and the Lake Motel was demolished. (Pl.'s SOF ¶ 30.)

*The Investigations of the Fire*

A CFD fire marshal who investigated the fire, Karl Solms, arrived at the Lake Motel at approximately 4:22 a.m. on March 5, 2011. (Pl.'s SOF ¶ 24.) Solms investigated Room 109 and found that a localized fire had occurred within that room. (Pl.'s SOF ¶ 27.) Based on the burn damage he observed, Solms believed the fire started in the bathroom of Room 109 and entered into the wall. (Pl.'s SOF ¶ 28.)

Solms prepared a report of his findings regarding the investigation of the fire (the "CFD Report"). (Pl.'s SOF ¶ 31.) The CFD Report concludes that the fire originated in the bathroom of Room 109 and was the result of the open flame ignition of rubbish. (Pl.'s SOF ¶ 32.) As the term is used by the CFD, "open flame" does not denote specifically either an intentional or non-intentional source. (Pl.'s SOF ¶ 33.) Solms stated he did not find a smoke detector in Room 109. (Def.'s SOF ¶ 29.) According to the CFD Report, "After a thorough fire scene examination and after ruling out any accidental or natural causal factors it is the opinion of the [Reporting Fire Marshal] that this fire was caused by the open flame ignition of rubbish within the bathroom of Unit 109 that then extended through the adjacent wall to the roof above and throughout the subject structure." (Pl.'s SOF ¶ 36, Pl.'s SOF Ex. I at 7.) The CFD Report continued, "[t]here is the possibility that this fire was caused by the careless use of smoking materials[;] whether or not there is criminal culpability shall be the subject of the [Chicago Police Department Bomb &

Arson] Unit."[2] (Pl.'s SOF Ex. I at 7.) Solms did not investigate who may have started the fire or why someone may have started it, but he determined that the fire was ignited as the result of a human act. (Def.'s SOF ¶¶ 26-27.) Solms was aware that the last registered guest of Room 109 was John Morris, but he did not interview him. (Def.'s SOF ¶ 28.)

On March 10, 2011, Scientific Expert Analysis Limited ("SEA") was hired by United to investigate the cause and origin of the fire. (Pl.'s SOF ¶ 40.) Sarah Pendley conducted the investigation and prepared the Cause & Origin Report ("C&O Report") on behalf of SEA, using the National Fire Protection Association's published guidelines as a guide. (Pl.'s SOF ¶ 41; Def.'s SOF ¶ 31.) Pendley first visited the Lake Motel on March 11, 2011; by that time, boards were placed over the windows and doors of the motel. (Pl.'s SOF ¶¶ 42-43.) Pendley noticed that the building appeared to have been vandalized; in particular, the heating and air conditioner units were damaged. (Pl.'s SOF ¶ 44.) Pendley observed a fence being placed around the perimeter of the Lake Motel on March 11, 2011. (Pl.'s SOF ¶ 46.) The Fire Marshal told Pendley that there was a burnt towel found at the origin site, but she never found such a towel. (Def.'s SOF ¶ 33.) Pendley determined that the most severe fire damage was within the cavity of the partition wall of Room 109. (Def.'s SOF ¶ 34.) According to the C&O Report, there are two potential ignition scenarios for the fire: "the ignition of combustible materials, due to the discarding of smoking materials, or the intentional ignition of combustible materials." (Pl.'s

---

[2] Sagar Megh submitted, in support of its summary judgment motion, a report it contends was prepared by the Chicago Police Department ("CPD") Bomb & Arson Unit regarding the CPD's investigation of the fire. However, this evidence was not authenticated. The "evidence relied upon to establish facts for summary judgment purposes must be of a type admissible at trial, including 'properly authenticated and admissible documents or exhibits.'" *Callpod, Inc. v. GN Netcom, Inc.*, 703 F. Supp. 2d 815, 826 n.4 (N.D. Ill. 2010) (quoting *Smith v. City of Chicago*, 242 F.3d 737, 741 (7th Cir. 2001)). Accordingly, the CPD Report is not evidence to be properly considered for purposes of ruling on summary judgment.

SOF ¶ 47.) Pendley concluded the fire was the result of a "human act," that is, a human being took an action with a heat-producing item that placed it in the proximity of a fuel source. (Pl.'s SOF ¶ 51.) United does not dispute the C&O Report. (Pl.'s SOF ¶ 50.)

The SEA investigation determined that the Room 109 smoke alarm was located in the wastebasket of Room 109, and Pendley identified a mounting bracket on the ceiling of that room that was similar to the mounting brackets used in the other rooms of the motel. (Pl.'s SOF ¶ 52.) A 9-volt battery was located in a plastic cup in Room 109, and the smoke alarm recovered from the room required that type of battery. (Pl.'s SOF ¶ 53.) Pendley concluded someone had physically removed the battery from the smoke alarm. (Pl.'s SOF ¶ 54.) The SEA investigation was unable to determine whether the smoke alarms it removed from the Lake Motel had sounded alarms during the fire. (Pl.'s SOF ¶ 55.) Pendley did not determine who caused the fire. (Def.'s SOF ¶ 32.)

*The Insurance Claim*

Sagar Megh reported the fire to United, and on March 9, 2011, United hired Greg Martin, an independent property adjuster, to evaluate Sagar Megh's losses under the Policy. (Pl.'s SOF ¶¶ 57-58.) That same day, Sagar Megh hired the Alex N. Sill Company to evaluate its losses under the Policy. (Pl.'s SOF ¶ 59.) Both Martin and the Alex N. Sill Company determined that the actual cost value damages resulting from the fire was $1,740,042.67. (Pl.'s SOF ¶ 60.)

A Sworn Statement Proof of Loss, prepared by Sagar Megh and Martin, was submitted to United and asserted the amount of $1,740,042.67 as the actual cost value of the motel building. (Pl.'s SOF ¶ 62.) United sent a letter to Sagar Megh denying coverage under the Policy on April 25, 2012, on the basis that Sagar Megh intentionally misrepresented and/or concealed material facts and circumstances surrounding its claim. (Pl.'s SOF ¶¶ 63-64.)

10

## LEGAL STANDARD

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). If the moving party meets this burden, the nonmoving party cannot rest on conclusory pleadings but, rather, "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986)). A mere scintilla of evidence is not enough to oppose a motion for summary judgment, nor is a metaphysical doubt as to the material facts. *Robin v. Espo Eng. Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (citations omitted). Rather, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In considering a motion for summary judgment, the court views the evidence in a light most favorable to the nonmoving party, drawing all reasonable inferences in the nonmoving party's favor. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255). The court does not make credibility determinations or weigh conflicting evidence. *Id.* In reviewing cross-motions, the Seventh Circuit's "review of the record requires that we construe all inferences in favor of the party against whom the motion under consideration

is made." *Rosenbaum v. White*, 692 F.3d 593, 599 (7th Cir. 2012) (citations and internal quotations omitted).

## ANALYSIS

Sagar Megh moves for summary judgment in its favor against United, asserting United breached the terms of the Insurance Policy and is liable to Sagar Megh, relating to the actual cost value of the motel building, in the amount of $1,740,042.67 plus pre-judgment interest since July 6, 2011, and also finding in favor of Sagar Megh on all other claims asserted against United, including declaratory relief and bad faith. United opposes Sagar Megh's motion and further moves for summary judgment in its favor against Sagar Megh, on the basis that Sagar Megh failed to comply with the Policy's protective safeguard condition.

Sagar Megh asserts that no genuine issue of material fact remains with respect to United's breach of the insurance contract. Under Illinois law, the elements of a breach of an insurance contract are: "(1) the existence of a valid, enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Bryant v. Jackson Nat. Life Distributors, LLC*, Case No. 12 C 9391, 2013 WL 1819927, at *3 (N.D. Ill. April 30, 2013) (citations omitted). The parties agree that a valid, enforceable insurance contract exists. It is also clear that United has not paid Sagar Megh under the terms of the Policy.

*Protective Safeguards*

The issue addressed by both of the cross-motions is whether or not Sagar Megh adequately complied with the protective safeguard condition of the Policy. In particular, the Insurance Policy provided that Sagar Megh was required to maintain functional smoke detectors in each of the motel rooms. The Policy further indicates that Sagar Megh could not recover under the policy if a fire resulted in damage where, prior to the fire, Sagar Megh either was

aware of a suspension or impairment to the smoke detectors and failed to notify United, or if Sagar Megh failed to maintain any protective safeguard, including smoke detectors, over which Sagar Megh had control, in complete working order. (Policy at 52-54.)

Sagar Megh asserts it complied with this condition, because smoke detectors were present in each of the Lake Motel rooms at the time of the fire. However, it is unclear from the undisputed material facts if the smoke detectors in each room were in complete working order. Further, it is possible that the smoke detector in Room 109, where the fire originated, was removed at the time of the fire. Factual questions remain as to who may have removed the smoke detector and when it was removed.

Moreover, even if the smoke detector was removed by an individual beyond Sagar Megh's direction or control, it is not apparent from the undisputed facts whether or not Sagar Megh breached its duty by failing to incorporate additional safeguards, such as the construction of mesh or wire cages around the smoke detectors, to prevent motel guests from tampering with the smoke detectors.

In light of these issues, questions of material fact remain unanswered. "Summary judgment is appropriate only if the jury could draw but one conclusion from the evidence." *Aebischer v. Stryker Corp.*, 535 F.3d 732, 734 (7th Cir. 2008) (citing *Kedzierski v. Kedzierski*, 899 F.2d 681, 683 (7th Cir. 1990)). These questions of fact regarding the condition of the smoke detectors, and the duties owed by Sagar Megh, are more appropriately considered by a jury, and it is improper to render summary judgment as to the issue of protective safeguards at this stage of the proceedings.

*The Cause of the Fire*

The parties also hold contradictory positions about Sagar Megh's role in the cause of the fire. Sagar Megh asserts that there is no evidence to suggest that the fire was caused by an intentional act, nor any evidence suggesting Dipak or someone employed by Sagar Megh caused the fire to ignite. United opposes that contention and suggests that the facts support its theory that Sagar Megh or its officers caused the fire. Both sides agree that the fire was caused by a human act and was likely caused by smoking materials or open flame ignition.

Many of the facts asserted regarding the cause of the fire are unknown. United relies on information from the last registered guest of Room 109, John Morris, who insisted he and his guest did not have cigarettes or smoking materials in the room. United further contends that Dipak had motive to cause arson, due to his ongoing financial problems, and had the opportunity to start the fire, because he was located in an office where he could leave without being detected by the employees of the motel.

However, "evaluations of motive and intent are generally inappropriate for summary judgment . . . ." *Kyle v. Patterson*, 196 F.3d 695, 698 (7th Cir. 1999) (citing *Bartman v. Allis-Chalmers Corp.*, 799 F.2d 311, 312 (7th Cir. 1986)). It is improper, in considering motions for summary judgment, to make determinations of credibility or weigh conflicting evidence; these matters are best left in the hands of a jury. *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 704-705 (7th Cir. 2011) (citations omitted). Therefore, it would be inappropriate at this juncture to weigh the conflicting evidence regarding the undetermined cause of the fire, and summary judgment will not enter on this issue.

## CONCLUSION

Simply put, too many unsettled questions and factual disputes remain to permit summary judgment to enter in favor of either party. The issue of whether or not Sagar Megh adequately complied with the protective safeguard conditions required by the Policy and the issue of who caused the fire are fact-intensive inquiries best left to a jury. Based on the foregoing analysis, both motions for summary judgment filed by Sagar Megh [120] and United [212] are denied.

Date: November 6, 2013

JOHN W. DARRAH
United States District Court Judge